Good morning, everyone. Welcome to the Ninth Circuit. We're looking forward to this morning's arguments. We will call the cases in the order that they appear on the calendar, but the first case, Zhang v. Bing's Restaurant, Inc., has been submitted on the briefs, so the next case up is Ochs v. Eugene Emeralds Baseball Club, Inc., if counsel for that case are ready. May it please the Court, a reasonable jury could find that the repeated abusive language described by the plaintiff in this case created an objectively hostile work environment. The testimony describes constant misogynistic, infective, and epithets. The most common term that was used by the employer to refer to the plaintiff was a bitch. He called her a bitch. He also called her a money-hungry bitch, an effing bitch, and asked someone rhetorically, why do you have to be, quote, such a bitch? This Court's on-bank decision in Costa correctly characterizes that sort of horrid language as gender-based and misogynistic. The Court described the sexual epithet a sex-based slur, offensive sexual language, and a derogatory term indicating sex-based hostility. Counsel, can we just rely on the words, or do we have to look at the context in which they were used here? No context beyond what's apparent. When the context is, he called her a bitch, that's sufficient. Now, bitch sometimes is used other ways. It can be a the players bitched about having to do push-ups. That's not a misogynist, except that it's a different usage. So if he directs it to an individual and uses the term, regardless of the context, that's enough to create a hostile work environment? There are two sub parts to the answer to that. The first one is, a reasonable jury could infer that that was a misogynistic remark. There might be a jury issue. The second question is, how frequently did it occur? The testimony here is that it was constant. I want to ask you about that, because what do we have to credit on summary judgment to frequency? At one point, your client said that it was almost daily. Yes. And then at another point, she kind of backed off on that. How frequent, and maybe it doesn't matter, it may be either one meets the plaintiff, which version are we supposed to credit for purposes of summary judgment? I think you credit the version more favorable to the plaintiff. That would be for the jury to sort out a trial. Well, what if she had later said, oh, I actually, he only used it once the entire time I was there. Would still credit the fact that she, at one point, said that it happened every day, or nearly every day? The question, I think, would be whether a jury would credit a favorable account. So you could conceivably have circumstances where you can conclude that a reasonable jury just couldn't believe the first story. But the standard would be, could a reasonable jury credit. So I wouldn't want to suggest there couldn't conceivably be circumstances like that. There's also testimony that she used the word frequently as well, and that this was sort of how it was done. Locker room talk might be fairly appropriate for a baseball team here. Does that have any bearing on that, in this case, where there appeared to be an acceptability? Somewhat of acceptability. I don't want to state it too far, but for the use of those terms in this work environment. We think not under these circumstances for a couple of reasons. The first of all, the use of the epithet bitch by a man directed at a woman is a misogynistic use of the term. She might have used it in some other term. The one reference we have is to an email where she's expressing excitement about the fabrication of some jerseys for the team that she pursues, the purple rain jerseys. And at one point, it says, bitches! I have no idea what that means, but it's not a racial epithet. Well, but that's an example where you might say the context does matter because she used the term, and perhaps we could say that that wasn't a derogatory use of the term. And I guess that's what I'm trying to understand, is if we say, look, the term was used, is that enough end of story, or do we really have to dig in? And how deep do we have to dig into the context here? I think if it's directed at someone as an epithet, calling someone a bitch, that's all you need to know. Okay. But that's only for the first element, correct? Well, there are three... You got three elements for this hostile work environment claim. The first is that they're subject to conduct of harassing nature because of sex. Seems to me you've said a lot about that subject to verbal and physical conduct, but conduct was unwelcome. Seems to me we have to have some evidence of that, which you may have suggested something about that, but I don't know that we've really focused on that. And then the last, it has to be severe or pervasive, right? Yeah. So if I might direct my attention to those two questions. First of all, a reasonable jury could infer that a woman would take offense at being labeled a bitch, a money hungry bitch, such a bitch, or an effing bitch. I think that language is serious enough that you don't require her to have additional testimony. So we're now to conduct was unwelcome. Yes. How about severe or pervasive? Well, this court has, on 18 occasions, indicated that whether the conduct was sufficiently severe or pervasive to create a hostile work environment is a jury question. Now, the testimony in this case would clearly, if credited, would clearly support a finding this was pervasive. As you noted, she repeatedly described it as more times than I can count, almost a daily basis, throughout the season ongoing. And another witness described the use of the word bitch directed at her as regularly and multiple times. That was half, right? That was half. So a reasonable jury could conclude that that was pervasive. And again, we're not asking you to make that defamation. That's not the issue before us. The question is, could a reasonable jury draw that conclusion? And we think it could. So our case law also requires not only an objective determination, but also a subjective determination. In your brief, you've suggested... There's not a lot of case law in the Ninth Circuit on the subjective portion. You've suggested in your brief that her affidavit saying that this made me feel this way in a conclusive way satisfies that. Is that your position here, or is there other evidence you can point to for the subjective prong? I think we'd rely on that. I'm not sure it would be fair to characterize the summary judgment notion as addressing that element. It's very rare for a defendant to argue for summary judgment on the subjective side of that. I think the objective side is the question here. Well, but you have a duty to show a material issue of fact on the subjective portion. And my question is, have you satisfied that with her affidavit? Is that enough in your mind to come forward with an affidavit that has a conclusory statement? We think it is, but to drill down a bit deeper, under Rule 56, the responsibility of the plaintiff is to show a material fact about the issues raised in the summary judgment motion. There's nothing in the record about the amount of damages. She wasn't obligated to adduce evidence of that because it wasn't what the motion was about. The motion is just about the objective side, then she wouldn't be expected to address the subjective side. And you wouldn't want to tell litigants that they had to do that because it makes the work of the district... Well, but we have told litigants that they have to show that they have to show... Come forward with some evidence that this is pervasive enough that it alters the terms of her employment. And here we have a situation where, by all accounts, she was meeting all of the obligations that she had. She was succeeding, she was doing well. Has she come forward with enough evidence under that prong to show that this was subjectively altering the terms of her employment because of the hostile work environment? It's our contention that her affidavit would suffice. And the Supreme Court decisions are clear that she doesn't have to show that the harassment interfered with her ability to do her work. I think I'd like to reserve the balance of my time. Okay. Very good. Let's hear from counsel for the defendants. Good morning, Your Honor. Cassie Jones for defendants, Eugene Emeralds. On the hostile work environment claim, since we've spent the morning talking about that, I wanna start there. I do believe that there are no facts in the record on which a court can find that all elements of that claim were made. Which elements are not satisfied? I don't believe the subjective element is satisfied. I don't believe the severe or pervasive element. Tell me why the subjective... I actually think Oaks' counsel has missed some of the evidence, and that's why I was drilling down. She testifies at one point that she was so bothered by his conduct that she got in an elevator with him and couldn't even ride up the elevator and had to get out. Why isn't that enough? Yeah, well, Your Honor, I think that's a specific instance where she said that they were in the middle of a fight and she was so upset by it, she wanted to get off the elevator. That's one instance. Why isn't that enough? Well, I think the case law has shown that that's not enough. There has been far worse conduct in Oregon cases and in Ninth Circuit cases, which weren't found to be severe or pervasive under the hostile work environment claim. There are cases where people were sexually assaulted and it wasn't found to be enough because it was one instance. Yeah, but that was one... That was a situation where a supervisor took action and removed the individual after they committed sexual assault. Your position can't be that if a supervisor knows that someone just committed sexual assault once and takes no action, that that doesn't create a hostile work environment. There are cases that have that fact pattern in them, and there's not a hostile work environment... What case... You're sending me to a case where a supervisor has not taken any action against a report for sexual assault and that hasn't been found to be... I believe the Maine's had that fact, or that... I'm sorry, Maine's did... I was gonna say don't be Maine's. No, no, no, not Maine's. I don't think that's your best case. It is definitely not our best case, Your Honor. I think that there were... There are multiple cases where it found that the supervisor... Renega and Maine's were the ones that I think spelled out specifically that supervisors have to do a lot more than just one comment or one physical encounter. There was a litany of facts in those two cases, and those are kind of the cases that show how severe and pervasive this needs to be. How much more severe and pervasive would you expect this to be? I mean, this language seemed to be pretty outrageous as I read it. Your Honor, we're not excusing the language, but I think, as the US Supreme Court has said, this is not a general civility test, and I think that there is vulgar language that can be used... Civility? General civility? You're suggesting this is general civility? I'm suggesting it's not general civility. I'm saying a hostile work environment claim is not a general civility test, though, and so it's not looking at just vulgar statements or even statements of a sexual nature. It's completely contextual, and it has to be that somebody is harassed and it alters the conditions of their employment based on their sex. I think that there are two instances in the record during the actionable time period. I agree that you can look to other instances that are discussed in the year that is in the statute of limitations. Well, she puts forward in an affidavit, this is why I was trying to drill down on how pervasive it is. We see this a lot where a plaintiff makes one statement and then counters it with another statement. This one doesn't seem to be quite that. Even if you took her least... The most restrained version of what she said. I gotta be honest, it doesn't look good for your client. And I don't think my client stands by the fact that he used the term fucking bitch, but I think that in the context of this case, I think you have a lot more evidence than just that. You have evidence that she used that terminology against Mr. Benavidez by a disinterested witness, her own witness, said that she constantly started these fights. But that's... All that does is have a question of fact as to whether we have a severe or pervasive environment. That doesn't get you by the summary judgment standard. I don't think it does, Your Honor, because I frankly find the case that says it doesn't. Because on summary judgment, I have to give every benefit of the doubt to the non moving party. And I don't find a case that suggests that in this kind of a circumstance, I could absolutely suggest that you survive summary judgment. Your Honor, I think... What's your best case? It isn't Mays. I think on... Well, I think the US Supreme Court case of Oncowler talks about what Title VII prevents. I don't think that'll help you either, Rita. Well, I think it does. I think it says that you look at context, Your Honor, and I think here you don't have any testimony regarding that this is really unwelcome other than her declaration which says it in a conclusion. And I think we've laid out the case law that says you can't just have conclusory statements to meet the elements of your claim. But isn't there also evidence that she made this statement? I thought other witnesses came forward that she had told them this was unwelcome during the time of her employment. Not any of these particular statements. No, Your Honor, there was no testimony to that effect. In fact, her witness is the one who talks about this language being pervasive, that she couldn't testify that she was discriminated against or that she hadn't really witnessed any of these instances. In 2015, Nicole Oakes said she wrote down every instance of discrimination in an agenda, and there were two instances. One where she was supposedly called an ass face in a promotional meeting, and one where she was called a fucking bitch. I don't think that that instance, when they're in a heated fight, admittedly started because Ms. Oakes questioned Mr. Benavidez's decisions over the radio that the whole staff was on. They got in a heated fight, and he said, fucking bitch. I don't think that that establishes that there was a severe and pervasive environment that was based on discrimination in this workplace. I just don't. On the other claims, unless the court has more questions about hostile work environment, I think the facts clearly show that these claims were not made. There's two claims relating to retaliation that I want to address briefly. One is that Ms. Oakes was retaliated against for engaging in protective activity of making complaints about OLCC violations. These were reportedly made between 2013 and 2015 baseball seasons. There's no evidence in the record that any retaliation actually occurred because she made those complaints. In fact, other employees made the same complaints and nothing was done. Ms. Oakes wasn't terminated until December after an argument that, while there are some details that are disputed, Ms. Oakes' account describes legitimate reason why she was terminated. She told her boss that he was no leader. She swore at him. They got in a yelling match. There's a dispute at who yelled first. She left the office, and Mr. Benavidez decided to terminate her at that time. At no point were any OLCC violations brought up at that time, nor any time near. The last complaint was made sometime in August of 2015, and when asked how she was retaliated against for making that complaint, she simply stated that she was undermined by her boss. She didn't even allege she was fired because of it. The second claim she makes is that she made a claim of hostile work environment, and she was fired because of that claim. That complaint happened after the dispute on December 4th, when she left the office. The undisputed evidence shows that Mr. Benavidez emailed his wife and said, I had to fire Nikki today. He had his assistant general manager draft a final paycheck. There's been some discussion in the reply brief in this case that the final paycheck shouldn't be believed because eventually she received an additional paycheck that was a different date. I don't think the court should consider that argument given that Ms. Oakes refused to come back or communicate with Mr. Benavidez about that final paycheck, so a new check had to be issued at a later date when she would come in and cooperate. Did Mr. Benavidez have sole authority to fire her, or did he have to seek authority from anyone else? He had sole authority in all the evidence in the record. And your position would be, it doesn't matter whether it was communicated to her that she was fired, it's when he made the decision to do that. Absolutely, your honor. And the cases we cited, including Barno, state that the decision doesn't even have to be final, it just has to be considered. And an intervening protected activity wouldn't mean you have to change that. Well, I had some questions about that, because in September, he also made a determination that he was going to fire her, and then he eventually didn't fire her. He had decided that it was probably best to terminate Ms. Oakes, but he wanted to have a conversation with her, and in her review, thought that she was going to make the changes that he suggested. But that's the problem that I have with this, is how far down the line do we go with these questions? Does he have to be 51% sure he's going to fire her? Does he have to be 80% sure? Does he just have to be 10% thinking about firing her, and that's enough? Well, in this case, you don't have any indication he thought not to fire her. I mean, everything indicates he actually went to the step of drafting a final paycheck. Well, they continued to pay her, and they didn't communicate it to her. He texted her, he tried to get her to come in, he communicated it to his boss, to his wife, and he had his assistant general manager draft up the final check. I don't think that there's credible evidence in the record that any of that wasn't a final decision, or even a final enough decision. I mean, there was absolutely no evidence that legitimate, non-discriminatory reason put forth by the Emeralds was pretext. There's nothing in the record, or on summary judgment, was it even argued that this was just pretext. Everything was about whether or not bitch was a discriminatory word, basically, and that that was enough to get to summary judgment on every claim in this case. Because there was no evidence even presented on this fact, I don't think that it's worth going into it much farther, but I do want to say the single actor inference also really does apply here, for many reasons, including the one that Mr. Benavidez selected Ms. Oaks to come to Nashville. He gave her a raise, he continued to give her favors. He cannot be found to have a discriminatory animus because there hasn't been extraordinary showing that he has a discriminatory thought about women. That's all, Your Honor. Thank you. Okay. Thank you very much. You have some time for rebuttal. Thank you, Your Honor. Just a few quick points. With regard to the question of when the decision was really made, in addition to the points that Judge Nelson made, there is other evidence that suggests this wasn't really a final decision. There's the initial disclosure in which the defendant asserted that Elmore assisted in the decision. That couldn't have happened at the time they contend the decision was made. Several days after December 4th, there was a conversation between Elmore and the plaintiff in which Elmore, according to the plaintiff, said, let's try to work this out. Again, a jury could infer from that that they were still considering what to do about all that. With regard to the question of whether there's evidence of pretext here, as we've said on our brief, the account of the defendant has changed. The original account was she was fired because she came into Benavidez's office after the meeting and started to scream at him. This went on and on until finally Benavidez raised his voice in response. That account has vanished from their brief. Their account now is somehow there was yelling and she was fired for yelling. It's just not the same story. And the question is, what was the subjective motive of Benavidez at the time? His account is directly contradicted by her account of what happened. And that's a jury question. Thank you very much. Thank you, counsel. The case just argued is submitted.
judges: N.R. Smith, Watford, R. Nelson